IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | Criminal Action No. 23-49-CFC |
| MARTIN FOUNTAIN, | |
| Defendant. | |

## MEMORANDUM

The Superseding Indictment in this action charges Defendant Martin Fountain with two counts of drug offenses. D.I. 18. Fountain moved to suppress all physical evidence seized by law enforcement officers during the search of his residence at 7 Carolyn Court, Dover, Delaware in May 2023. D.I. 88. I denied the motion by an oral order docketed on October 3, 2024. I explain in this Memorandum why I denied the motion.

The challenged search was conducted pursuant to a warrant issued on May 16, 2023 by Magistrate Judge Fallon. D.I. 88-1 at 68. The application for the warrant was supported by a 62-page affidavit submitted by Drug Enforcement Administration (DEA) Task Force Officer (TFO) Christopher Solda. D.I. 88-1 at 1–62.

Fountain argued that Judge Fallon issued the warrant in violation of the Fourth Amendment because TFO Solda's affidavit "was defective in that it failed to establish a sufficient nexus between Fountain's alleged drug dealing and [his] residence[.]" D.I. 88 at 2. He also stated in his motion that "the credibility of the affidavit, as will be shown at a *Franks* hearing, cannot withstand scrutiny[.]" D.I 88 at 3. I address these arguments in turn.

I.

The Fourth Amendment prohibits unreasonable searches and seizures. U.S. Const. amend. IV. It provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

*Id.* "The ultimate touchstone of the Fourth Amendment . . . is reasonableness." *Michigan v. Fisher*, 558 U.S. 45, 47 (2009) (*per curiam*) (internal quotation marks and citation omitted). To deter the government from violating the Fourth Amendment, evidence collected through an unreasonable search or seizure may be suppressed. *See United States v. Katzin*, 769 F.3d 163, 169 (3d Cir. 2014). Evidence that is not acquired directly through a Fourth Amendment violation but would not have been acquired but for investigators exploiting a Fourth Amendment

violation may also be suppressed as "fruit of the poisonous tree." *United States v. DeSumma*, 272 F.3d 176, 179 (3d Cir. 2001) (citing *Wong Sun v. United States*, 371 U.S. 471, 488 (1963)).

A district court tasked with reviewing the legality of a challenged search warrant is to "conduct only a deferential review of the initial probable cause determination made by the magistrate" who issued the order. *United States v. Stearn*, 597 F.3d 540, 554 (3d Cir. 2010) (citation omitted). "The role of a reviewing court is not to decide probable cause *de novo*, but to determine whether 'the magistrate had a substantial basis for concluding that probable cause existed.'" *Id.* (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)).

"When the crime under investigation is drug distribution, a magistrate may find probable cause to search the target's residence even without direct evidence that contraband will be found there." *Stearn*, 597 F.3d at 558. But the affidavit is insufficient if it "suggests only that the suspect is actually a drug dealer and that the place to be searched is possessed by, or the domicile of, the suspect. There must also be evidence linking the targeted location to the suspect's drug activities." *United States v. Williams*, 974 F.3d 320, 351 (3d Cir. 2020) (internal quotation marks, alterations, and citations omitted).

TFO Solda's affidavit provided more than a substantial basis to conclude that there was probable cause that drugs would be found in Fountain's residence. As detailed in the affidavit:

- During an investigation that commenced in June 2022, an investigative team consisting of officers from the Delaware State Police (DSP) and the Dover Police Department (DPD) and agents from the DEA identified Martin Fountain as a high-level member of a drug trafficking organization (DTO) with operations in Delaware and Pennsylvania. D.I. 88-1 ¶¶ 1–2.

- As part of the investigation, DEA agents wiretapped Fountain's cell phone pursuant to court orders issued on March 24, 2023 and April 21, 2023. *See* D.I. 88-1 ¶¶ 26–28. Through the wiretaps, DEA agents overheard Fountain organize several drug sales and read text messages between Fountain and individuals seeking to purchase drugs from him. D.I. 88-1 ¶¶ 82, 85, 90, 94, 105, 106, 107, 110, 128.

- Two confidential sources identified Fountain as a large-scale drug distributor who lives in Dover. One source said he had purchased drugs from Fountain prior to the start of the investigation. D.I. 88-1 ¶¶ 30, 32.

- In January 2023, the DSP and DEA conducted two controlled drug purchases from Fountain near his residence. D.I. 88-1 ¶¶ 34, 81. The first purchase occurred on January 5. On that date, a confidential source met with Fountain "in the middle of the road in the area of" Fountain's residence to purchase one gram of suspected fentanyl for $150. D.I. 88-1 ¶ 83. The second purchase occurred on January 18, when a confidential source met Fountain "in the area of" Fountain's residence to purchase one gram of suspected fentanyl for $150. D.I. 88-1 ¶ 86. Fountain was observed leaving his

4

residence to conduct the deals and returning there afterwards on both occasions. D.I. 88-1 ¶¶ 83, 86.

- On March 27, 2023, at approximately 8:20 p.m., investigators saw a Chrysler 300 arrive and park at Fountain's residence. D.I. 88-1 ¶ 92. At 8:21 p.m., Fountain received an incoming call from Durell Patton, another member of the DTO. D.I. 88-1 ¶¶ 90, 4. Patton asked Fountain if Patton could get drugs for Patton and another unidentified person. D.I. 88-1 ¶ 91. Three minutes later, Fountain exited his residence and entered the Chrysler. D.I. 88-1 ¶ 92. Approximately ten minutes later, Fountain got out of the Chrysler and walked to the back of his residence. D.I. 88-1 ¶ 92. Investigators maintained surveillance on the Chrysler as it left Fountain's residence and traveled to another residence in Dover. At that point investigators saw Patton exit the Chrysler's front driver seat and go inside the residence. D.I. 88-1 ¶ 93.

- On April 5, 2023, at approximately 2:55 p.m., Fountain received an incoming call from Patton. D.I. 88-1 ¶ 94. Patton informed Fountain that he was "trying to debate if I want- uh a half, the whole, or a quarter." D.I 88-1 ¶ 94. Fountain responded, "you might as well just take this whole," and "I'll talk to you about it when you pull up." D.I. 88-1 ¶ 94. At approximately 3:05 p.m., law enforcement observed Patton enter a business located on State Street in Dover. D.I. 88-1 ¶ 95. About ten minutes later, law enforcement saw Patton and Fountain exit the building together, enter Patton's vehicle, and drive to Fountain's residence. D.I. 88-1 ¶ 95. Fountain briefly visited his residence, and then returned to Patton's vehicle. D.I. 88-1 ¶ 96. At approximately 3:29 p.m., Patton and Fountain drove from the residence back to the State Street location. Thirty minutes later, Patton drove to a location where investigators believe he stores bulk quantities of drugs. D.I. 88-1 ¶¶ 96, 149. "As soon as Patton went inside," investigators intercepted a call

5

      between Patton and Fountain regarding the weight of drugs provided by Fountain. D.I. 88-1 ¶ 96.

- Cell tower data for Fountain's phone and GPS tracking data for his Dodge Charger showed that for the duration of the investigation Fountain spent his nights at this residence. D.I. 88-1 ¶ 112.

This evidence is more than sufficient to establish probable cause that Fountain was a drug dealer in the spring of 2023 and that evidence of his drug dealing—including, but not limited to, drugs, drug packaging materials, and proceeds obtained from drug sales—would be found at his residence.

    Fountain purported in his motion to "itemize[], paragraph by paragraph" the "particular defects" of TFO Solda's affidavit. D.I. 88 at 3. He pointed first to paragraphs 64 and 65. These paragraphs read:

> 64. At approximately 2:26 p.m. [DF] arrived at the Grotto's Pizza located at 1159 North Dupont Highway Dover, Delaware. Immediately after [DF] arrived at the location, M. FOUNTAIN also arrived in [Fountain's car] and both subjects walked inside. At approximately 3:12 p.m. [W] arrived and went inside. At approximately 5:09 p.m. M. FOUNTAIN leaves Grotto's and responds back [Fountain's residence] before conducting a drug deal in the area. M. FOUNTAIN then returns to Grotto's to continue meeting with [DF] and [W]. At approximately 8:56 p.m. [DF], [W], and M. FOUNTAIN are all still at Grotto's Pizza. During this time M. FOUNTAIN responds to the parking lot to conduct a drug deal.
>
> 65. Your Affiant believes that [DF] met with M. FOUNTAIN and [W] to provide them with drugs and discuss activities of the DTO. Your Affiant believes

6

> when M. FOUNTAIN leaves shortly after and responds back to [Fountain's residence] it is to place the bulk of the drugs he received there before responding to meet with subjects to conduct drug deals.

D.I. 88-1 ¶¶ 64–65.

Fountain argued in his motion that "[n]othing in [paragraph 64] provides any details regarding persons involved in the 'drug deal'; how the 'drug deal' was observed; nor whether the 'drug deal' occurred indoors, or outdoors, or in exactly what 'area.'" D.I. 88 at 3–4. And he contended that, "[w]ith the lack of concrete details to this 'drug deal,' [TFO Solda's] subjective 'belief' [[in] Paragraph 65] that a drug deal had occurred is unpersuasive, warranting excision of paragraphs 64 and 65 from the search warrant affidavit." D.I. 88 at 3–4 (third alteration in the original).

Fountain's criticisms of paragraphs 64 and 65 are well-founded, and I therefore treated the paragraphs as if they had been excised from the affidavit. I assumed Judge Fallon did not rely on the conclusory and unjustified assertions in paragraphs 64 and 65 in issuing the warrant; but in any event, I did not rely on the conclusory and unjustified assertions in paragraphs 64 and 65 in determining that the affidavit provided a substantial basis for Judge Fallon to conclude that probable cause existed to believe that drug-dealing-related items would be found in Fountain's residence.

7

Fountain next took issue with paragraphs 82, 83, 85 and 86 of the challenged affidavit. Those paragraphs read:

> 82. On January 5, 2023, your Affiant picked CS-3 up from a neutral location as witnessed by another law enforcement officer. While with CS-3, your Affiant checked CS-3 for any contraband or money with negative results. At approximately 12:52 your Affiant directed CS-3 to contact M. FOUNTAIN by telephone call to [Fountain's phone]. The communications between CS-3 and [Fountain's phone] were of an illicit nature. Specifically, based on my training and experience, the communications were indicative of CS-3 setting up a meeting to purchase drugs.
>
> 83. Immediately after the phone call your Affiant drove CS-3 to meet with M. FOUNTAIN. A few minutes later your Affiant and CS-3 arrived at the meet location. At approximately 1:15 p.m. your Affiant observed CS-3 and M. FOUNTAIN meet and conduct an exchange in the middle of the road in the area of [Fountain's residence]. M. FOUNTAIN sold CS-3 approximately one gram of suspected fentanyl for $150.00. Your Affiant was watching CS-3 with an unobstructed view for the entirety of his or her meeting with M. FOUNTAIN; CS-3 did not meet with any other people except for M. FOUNTAIN. M. FOUNTAIN was observed responding from [Fountain's residence] and returning to same after the deal.
>
> \* \* \* \*
>
> 85. On January 18, 2023, your Affiant picked CS-3 up from a neutral location as witnessed by another law enforcement officer. While with CS-3 your Affiant checked CS-3 for any contraband or money with negative results. At approximately 12:18 p.m. your Affiant directed CS-3 to contact M. FOUNTAIN by telephone

8

> call to [Fountain's phone]. The communications between CS-3 and [Fountain's phone] were of an illicit nature. Specifically, based on my training and experience, the communications were indicative of CS-3 arranging to meet with M. FOUNTAIN to buy drugs.
>
> 86. Immediately after the phone call your Affiant drove CS-3 to meet with M. FOUNTAIN. A few minutes later your Affiant and CS-3 arrived at the meet location. At approximately 12:45 p.m. your Affiant observed CS-3 and M. FOUNTAIN meet and conduct an exchange in the area of [Fountain's residence]. Your Affiant was watching CS-3 with an unobstructed view for the entirety of his or her meeting with M. FOUNTAIN; CS-3 did not meet with any other people except for M. FOUNTAIN. CS-3 then met with your Affiant to hand over the substance he/she purchased from M. FOUNTAIN and was searched for money and for other contraband with negative results. FOUNTAIN sold CS-3 approximately one gram of suspected fentanyl for $150.00. M. FOUNTAIN was observed responding from [Fountain's residence] and returning to same after the deal.

D.I. 88-1 ¶¶ 82–83, 85–86.

Fountain argued that these paragraphs "must be excised from the affidavit as unpersuasive" because "[TFO Solda's] location from where he observed the alleged transaction is unstated" and "the exact proximity of the exchange to 'the area of [Fountain's residence]' is unclear." D.I. 88 at 4; *see also* D.I. 88 at 5. But even though the ambiguous phrase "in the area of Fountain's residence" is not ideal, the paragraphs provide sufficient detail, particularly with respect to the temporal proximity of the observed controlled buys, CS-3's calls to Fountain's

phone, and Fountain's "responding from" and "returning to" his residence, to be probative of the presence of drug-related evidence in Fountain's residence.

Fountain also insisted that "the credibility" of TFO Solda's statements in these paragraphs "is subject to question in light of" an assertion made by Solda in an affidavit for an earlier wiretap application that Fountain's residence "is an unfriendly neighborhood with no areas to sit for surveillance." D.I. 88 at 4; *see also* D.I. 88 at 5 and D.I. 88 at 11. Here, again, Fountain's criticism is not completely without merit, and it shows sloppiness by TFO Solda and the Assistant United States Attorneys who reviewed his affidavits before submitting them to the Court. But the statement from the earlier affidavit was made in a section of that affidavit that addressed the availability of alternative law enforcement methods such as physical surveillance; and thus, the context of the earlier statement makes clear that the statement was explaining that consistent surveillance of Fountain's residence for extended periods of time was impractical. *See* D.I. 102-2 ¶¶135–142. I did not and do not read the earlier statement to mean that surveillance of Fountain's residence for limited periods was impossible, and therefore I did not and do not agree that the earlier statement cast doubt on TFO Solda's credibility.

Fountain next took issue with paragraph 88 of the affidavit. That paragraph reads:

> Between February 28, 2023 and March 1, 2023, CS-3 contacted M. FOUNTAIN and arranged a meeting in the area of 1007 North State Street Dover, DE to conduct a drug transaction. CS-3 met M. FOUNTAIN where M. FOUNTAIN sold CS-3 approximately one gram of fentanyl for $150.00. M. FOUNTAIN was observed responding to the meet location from [Fountain's residence].

D.I. 88-1 ¶ 88. Fountain argued, and I agree, that this paragraph "cannot be regarded as persuasive and must be excised from the affidavit," D.I. 88 at 6, because it does not state where the alleged transaction took place, does not provide the basis for TFO Solda's assertion that a drug transaction took place, and does not identify who allegedly observed Fountain. Accordingly, I treated paragraph 88 as if it did not exist, and I did not rely on the conclusory and unjustified assertions in paragraph 88 in determining that the affidavit provided a substantial basis for Judge Fallon to conclude that probable cause existed to believe that drug-dealing-related items would be found in Fountain's residence.

Fountain next challenged paragraphs 90 through 92 of the affidavit. Those paragraphs read:

> 90. On March 27, 2023 at approximately 8:21 p.m. M. FOUNTAIN received an incoming call on [Fountain's phone] from Durell PATTON at 302 [xxx-xxxx]. The conversation was as follows:
>
> > PATTON: Can I get it uh in 2 halves, 1 for me 1 for somebody else?
> > M. FOUNTAIN: Alright [U/I]

11

> PATTON: Yeah, so tomorrow I can take right to him ASAP.
>
> 91. During this call, based on your Affiant's training and experience, PATTON is requesting two halves of drugs from M. FOUNTAIN. Furthermore, PATTON says one is for him and one is for someone else.
>
> 92. On March 27, 2023 members of DPOD, DSP, and DPD established surveillance on [Fountain's residence] in reference to the above intercepted call between M. FOUNTAIN and Durell PATTON. At approximately 8:20 p.m. a dark in color Chrysler 300 arrived at [Fountain's residence] and parked in front. At approximately 8:24 p.m. M. FOUNTAIN exited [Fountain's residence] and entered the dark in color Chrysler 300. At approximately 8:35 p.m. M. FOUNTAIN exited the Chrysler 300 and walked to the back of [Fountain's residence]. At this time the Chrysler 300 backed into the driveway of [Fountain's residence]. At approximately 8:48 p.m. [the] Chrysler 300 left [Fountain's residence].

88-1 ¶¶ 90–92.

Fountain argued that "[t]he timeline provided in these paragraphs is confusing and unpersuasive." D.I. 88 at 6. But his contention is based on a misreading of the paragraphs. According to Fountain, the paragraphs' timeline "begins with" the 8:21 p.m. call and that "[p]aragraph 92 states that law enforcement *then* 'established surveillance on [Fountain's residence] in reference to'" the 8:21 p.m. call. D.I. 88 at 6–7 (emphasis added). Based on this reading of the paragraphs, Fountain argued that the statement in paragraph 92 that law

12

enforcement observed Patton park the Chrysler 300 at 8:20 p.m.—i.e., *before* the 8:21 p.m. transaction—is confusi[ng]." D.I. 88 at 7. But in point of fact, the affidavit does *not* state that law enforcement established surveillance of Fountain's residence on March 27, 2023 *after* the 8:21 p.m. call, and there is no reason that law enforcement could not have established the surveillance in question *before* the 8:21 p.m. call.

Fountain next argued that paragraphs 94 through 96 of the affidavit "must be excised" because they "fail[] to provide any details regarding the precise nature of the 'surveillance' on [Fountain's residence] so as to allow any judicial officer to critically weigh" the observations TFO Solda stated that law enforcement officers made of Fountain's movements on the afternoon of April 5, 2023. D.I. 88 at 8. But because of the nature of the observed actions in question—driving, walking, and entering and exiting a car—and their setting—outdoors and in public—no such details were required here. It was sufficient for TFO Solda to state, as he did, that law enforcement established surveillance and made the observations detailed in these paragraphs.

Fountain next challenged paragraphs 105 and 106 of the affidavit. Those paragraphs read:

> 105. On April 7, 2023, agents observed [DF] going to [Fountain's residence] for a brief meeting. After the meeting, M. FOUNTAIN contacted a female and

> conducted a drug transaction with her. First, he had intercepted calls over [Fountain's phone] with the unknown female using telephone number 302-[xxx-xxxx] ("UF1411"), during which they discussed where to meet ("I'm coming that way meet me at meet me at Great Wall" . . . "I'm across the street in the apartments across the street."). They appeared based on the final call at 8:09 p.m. to meet, with the female ending one call, " . . . yeah I'm coming, waiting until you get there I just got to come across the street here I come."
>
> 106. M. FOUNTAIN was observed by surveillance officers at a shopping center and having a brief meeting with a female during which M. FOUNTAIN handed the female an item, in a way that was consistent with a drug transaction. At 8:43 p.m., UF1411 sent a text message saying "(two thumbs up emojis) best hard candy I had in a few weeks, don't get me wrong it's some other candy out here but this is different and really good shit I can't talk Lol hahaha that's why I sent this letter." Based on my training and experience and the calls and surveillance observations, I believe that M. FOUNTAIN obtained crack cocaine ("hard candy") from [DF] at [Fountain's residence], then sold those drugs to the unknown female.

88-1 ¶¶ 105–106.

Fountain argued that "[n]othing in the above two paragraphs shows any facts supporting [TFO Solda's] 'belief' that drugs emanated from [Fountain's residence]." D.I. 88 at 9. Fountain is correct, and therefore I treated as excised from the affidavit the statement in paragraph 106 that "I believe that M. FOUNTAIN obtained crack cocaine ("hard candy") from [DF] at [Fountain's residence]." I did not rely on that statement in determining that the affidavit

14

provided a substantial basis for Judge Fallon to conclude that probable cause existed to believe that drug-dealing-related items would be found in Fountain's residence.

Fountain next challenged paragraphs 107 through 109. D.I. 88 at 9. Those paragraphs read:

> 107. On April 10, 2023, at approximately 8:28 p.m. M. FOUNTAIN engaged in a text message conversation with [CM]. The conversation is as follows:
>
> > [CM]: Hey where u at I need a half one
> > [CM]: Yo it's Christina u around
> > M. FOUNTAIN: Yup
> > [CM]: Need half one where u at
> > M. FOUNTAIN: Same place
> > [CM]: OK I'm on way
> > [CM]: I got a question do u have any needles? Or can u find any
> > M. FOUNTAIN: No
> > [CM]: OK I'm on way
> > [CM]: B in same truck
> > M. FOUNTAIN: (Flex Arm emoji)
> > [CM]: Be there 5 min start walking
> > M. FOUNTAIN: K
> > [CM]: Turning round
> > M. FOUNTAIN: Ok
> > [CM]: Here I come
> > M. FOUNTAIN: (Flex Arm emoji)
>
> 108. On April 10, 2023, surveillance was established in the area of [Fountain's residence] in reference to the above conversation. At approximately 8:51 p.m. a surveillance officer observed [CM] operating a tan pickup truck with the tail gate down traveling eastbound on Lewis Drive toward [Fountain's residence]. Between

> approximately 8:53 p.m. and 8:55 p.m., surveillance officers saw [CM] and M. FOUNTAIN both in the area of Persimmon Circle at Persimmon Tree Lane (near[b]y [Fountain's residence]). During this incident M. FOUNTAIN was observed coming and going from the area of [Fountain's residence].
>
> 109. At approximately 8:58 p.m. an officer conducted a traffic stop of [CM] due to expired registration. The officer's K9 partner Nuke conducted an open air sniff of the vehicle and positively indicated for the presence of drugs inside. [CM] was found to be in possession of approximately 5 bundles of fentanyl. [CM] was arrested without incident.

D.I. 88-1 ¶¶ 107–109.

Fountain argued that "paragraph 108 must be excised from the affidavit" because "[n]o detail is provided for the recital that 'M. Fountain was observed coming and going from the area of [Fountain's residence]'" and because "[w]ithout detail regarding the alleged vantage point for this observation of Fountain's comings and goings, nor any detail regarding how wide 'the area of [Fountain's residence]' is, the Magistrate could not critically assess any nexus between the alleged activity and [Fountain's residence][.]" D.I. 88 at 10. I agree that the phrase "in the area of" in the statement in paragraph 108 that "[d]uring this incident M. FOUNTAIN was observed coming and going from the area of [Fountain's residence]" is ambiguous and I assumed that Judge Fallon did not rely on that statement to conclude the existence of a nexus between Fountain's

residence and his alleged drug activity. In any event, I did not rely on that statement in determining that the affidavit provided a substantial basis to conclude that evidence related to Fountain's drug dealings would be found in his residence.

Fountain next challenged paragraphs 110 and 111 of TFO Solda's affidavit. Those paragraphs read:

> 110. On May 1, 2023, at approximately 7:44 p.m. M. FOUNTAIN received an incoming call on [Fountain's phone] from PATTON at (302) [xxx-xxxx]. The pertinent part of the conversation is as follows:
>
>> PATTON: [U/I] right now I'm [U/I] I gotta two half [U/I] and maybe a vic. I know the two they definitely want it
>> M. FOUNTAIN: Aight
>> PATTON: I told them I'll be ready for them in like 15 minutes
>> M. FOUNTAIN: Aight
>> PATTON: I ma [U/I] It might it be longer than that so, but just get them ready for me. I'm gonna grab that
>> M. FOUNTAIN: Okay. Two and a half I got you
>> PATTON: Aight
>
> 111. On May 1, 2023, surveillance was established in the area of [Fountain's residence] in reference to the above conversation. At approximately 8:21 p.m. DPD Det Brennan observed PATTON enter TARGET VEHICLE-5 which was in the Town Point neighborhood in Dover. At approximately 10:00 p.m. DPD Det Krogh observed [Patton's car] parked in front of [Fountain's residence]. At approximately 10:08 p.m. Det Krogh observed [Fountain's car] and [Patton's car] leave [Fountain's residence].

17

D.I. 88-1 ¶¶ 110–111.

Fountain argued that "[g]iven [their] unpersuasiveness, paragraphs 110–111 must be excised from the Affidavit." D.I. 88 at 1. I agree that paragraph 111 is not probative of drug dealing by Fountain and therefore have not relied on it in any way. Paragraph 110, however, is probative of Fountain's drug dealing, and I relied on it to the extent it shows that Patton was asking Fountain to supply Patton with drugs. I did not rely on paragraph 110 with respect to the issue of whether the challenged affidavit provided a substantial basis to conclude that evidence of Fountain's drug dealing would be found in his residence.

Fountain next argued that paragraph 112 "must be excised from the affidavit" because it referred to but did not include as an attachment "authorized cell tower data" and "GPS tracker data." D.I. 88 at 11. There is, however, no requirement that the government attach to a search warrant affidavit cell phone or location tracking data referred to in the affidavit, and Fountain has not suggested that TFO Solda misrepresented or improperly relied on the data in question.

Finally, Fountain took issue with this statement from paragraph 148 of the affidavit: "As previously mentioned in this affidavit regarding [Fountain's residence], PATTON has been observed receiving drugs from M. FOUNTAIN and going back to [another residence]." D.I. 88-1 ¶148. Fountain did not dispute that in earlier paragraphs of the affidavit TFO Solda had described facts from which it

18

could be inferred that Fountain sold drugs to DP. *See, e.g.,* D.I. 88-1 at ¶¶ 90–96. But he argued that "[t]he Affidavit's inference of drug dealing is not an 'observation'" and that therefore paragraph 148 "misled the Magistrate." D.I. 88 at 11. I reject, however, Fountain's narrow interpretation of "observation" in this instance. "Observe" can mean "see with one's eyes." But it can also mean "to come to realize or know especially through consideration of noted facts," https://www.merriam-webster.com/dictionary/observe [https://perma.cc/CX7R-MYL8], and it is clear that TFO Solda was using "observe" to have this latter meaning in paragraph 148.

To sum up: The challenged affidavit provided more than a substantial basis from which to conclude that probable cause existed that Fountain was a drug dealer in the spring of 2023 and that evidence of his drug dealing—including, but not limited to, drugs, drug packaging materials, and proceeds obtained from drug sales—would be found at his residence. None of the "particular defects" "itemized" by Fountain cast doubt upon this conclusion. D.I. 88 at 3.

## II.

As noted, Fountain stated in his motion that "the credibility of the affidavit, as will be shown at a *Franks* hearing, cannot withstand scrutiny[.]" D.I 88 at 2. He did not, however, request in his motion a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978). Nor did Fountain even attempt to make in his motion a

19

preliminary showing that TFO Solda made knowingly or with reckless disregard for the truth a material false statement in his affidavit. *See United States v. Yusuf*, 461 F.3d 374, 383 (3d Cir. 2006) (holding that to overcome a warrant's presumption of validity and obtain a hearing to challenge the warrant's constitutionality, a defendant "must make a 'substantial preliminary showing' that the affidavit contained a false statement, which was made knowingly or with reckless disregard for the truth, which is material to the finding of probable cause." (quoting *Franks*, 438 U.S. at 171)). Accordingly, Fountain waived his right to a *Franks* hearing.

The fact that Fountain attempted in his reply brief to make that showing does not cure his forfeiture of the argument. *See United States v. Pelullo*, 399 F.3d 197, 222 (3d Cir. 2005), *as amended* (Mar. 8, 2005); *see also United States v. Himmelreich*, 2024 WL 4371551, at *3 n.9 (3d Cir. Oct. 2, 2024); *United States v. Olivetti*, 2024 WL 3292673, at *2 n.2 (3d Cir. July 3, 2024). And in any event, for the reasons set forth in the government's sur-reply, Fountain did not make in his reply brief a substantial preliminary showing of a knowing or recklessly made false statement that would warrant a *Franks* hearing. *See generally* D.I. 117.

 

_____
CHIEF JUDGE